# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS NIEMCZYK, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>PRO CUSTOM SOLAR LLC, d/b/a MOMENTUM SOLAR<br><br>Defendant. | Civil Action No. 2:19-cv-7846-ES-MAH |
| HERBERT WALTERS, RICK HILL, and BARRY WOLFORD, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>PRO CUSTOM SOLAR LLC, d/b/a MOMENTUM SOLAR<br><br>Defendant. | Civil Action No. 2:22-cv-00247-ES-MAH |

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

---

**MAZIE SLATER KATZ & FREEMAN, LLC**
Matthew R. Mendelsohn
103 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-9898
*Attorneys for Plaintiff and Putative Class*

# TABLE OF CONTENTS

<div align="right">Page</div>

INTRODUCTION ..................................................................................................................1

I.     FACTUAL AND PROCEDURAL BACKGROUND......................................................4

    A.    Factual Background .........................................................................4

    B.    Procedural History .........................................................................4

    C.    History of Settlement Discussions ..................................................6

II.    KEY TERMS OF THE SETTLEMENT ......................................................................7

    A.    Class Definition ..............................................................................7

    B.    Monetary Relief in the Form of a Non-Reversionary Common Fund....................7

    C.    Timing of Payments to Class Members ..........................................8

    D.    Class Member Claims Process ........................................................8

    E.    Release ............................................................................................8

    F.    Notice and Administration Expenses ..............................................9

    G.    Incentive Award, Attorneys' Fees, Costs, and Expenses...............9

ARGUMENT .......................................................................................................................10

I.     CLASS CERTIFICATION FOR SETTLEMENT PURPOSES IS APPROPRIATE .......10

    A.    Numerosity......................................................................................11

    B.    Commonality...................................................................................11

    C.    Typicality ........................................................................................12

    D.    Adequacy ........................................................................................12

    E.    The Proposed Settlement Class Satisfies the Requirements of Rule 23(b)(3).......14

II.    THE NOTICE PLAN COMPORTS WITH DUE PROCESS ...........................................15

III.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE
       AND SHOULD BE APPROVED BY THE COURT ......................................................16

    A.    The Proposed Settlement is Procedurally Fair (Fed. R. Civ. P. 23(e)(2)(B))........17

    B.    The Proposed Settlement is Substantively Fair ................................18

        1.    The complexity, expense and likely duration of the litigation
            (*Girsh* Factor 1)...........................................................................19

        2.    The reaction of the class to the settlement (*Girsh* Factor 2) .....................19

3.    The stage of the proceedings and amount of discovery completed (*Girsh* Factor 3)..................................................................................20

4.    The risks of establishing liability and damages (*Girsh* Factors 4-5) .........21

5.    The risks of maintaining the class through trial (*Girsh* Factor 6)..............21

6.    The ability of the defendants to withstand a greater judgment (*Girsh* Factor 7).......................................................................................22

7.    The range of reasonableness of the common fund in light of the best possible recovery (*Girsh* Factor 8) and the range of reasonableness of the common fund to a possible recovery in light of all the attendant risks of litigation (*Girsh* Factor 9) .......................................................................23

CONCLUSION.......................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baldwin Emergency Med. Serv. v. Highmark, Inc.*,
2006 WL 1867902 (W.D. Pa. June 30, 2006) ........................................................ 22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................ 14

*Baby Neal v. Casey*,
43 F.3d 48 (3d Cir. 1994) ................................................................................. 12

*Brown v. Rita's Water Ice Franchise Co. LLC*,
2017 WL 4102586 (E.D. Pa. Sept. 14, 2017) ....................................................... 2

*Browning v. Yahoo!, Inc.*,
2007 WL 4105971 (N.D.C.A. 2007) .................................................................... 3

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ........................................................................................ 15

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) .......................................................................................... 2

*Friedman v. LAC Basketball Club, Inc.*,
2014 WL 10677588 (C.D.Cal.) ........................................................................... 3

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975) ............................................................................. 19

*Haas v. Burlington Cnty.*,
2019 WL 413530 (D.N.J. Jan. 31, 2019) ............................................................ 21

*Hassine v. Jeffres*,
846 F.2d 169 (3d Cir. 1988) ............................................................................. 13

*Henderson v. Volvo Cars of N. Am., LLC*,
2013 WL 1192479 (D.N.J. Mar. 22, 2013) ................................................... 15, 17

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ............................................................................. 22

*In re Corrugated Container Antitrust Litig.*,
80 F.R.D. 244 (S.D. Tex. 1978) ....................................................................... 15

*In re Prudential Ins. Co. Sales Litig.*,
    148 F.3d 283 (3d Cir. 1998) ................................................................... 11

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)..................................................................... 22

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ................................................................... 10

*Ins. Brokerage Antitrust Litig.*,
    297 F.R.D 136 (D.N.J. 2013). ................................................................ 12

*Kazemi v. Payless Shoesource, Inc.*,
    2012 WL 8435251 (N.D.Cal.) ................................................................ 3

*Lusky v. Capasso Bros.*,
    118 N.J. Super. 369, 287 A.2d 736 (App. Div. 1972)............................ 10

*Malta v. Fed. Home Loan Mortgage Corp.*,
    2013 WL 444619 (S.D. Cal. Feb. 5, 2013)............................................. 3

*Maryland v. Universal Elections, Inc.*,
    862 F. Supp. 2d 457 (D. Md. 2012)....................................................... 24

*McCoy v. Health Net, Inc.*,
    569 F. Supp. 2d 448 (D.N.J. 2008)........................................................ 14

*Myers v. Jani-King of Philadelphia, Inc.*,
    2019 WL 4034736 (E.D. Pa. Aug. 26, 2019) ........................................ 1

*New York Career Guidance Servs., Inc. v. Wells Fargo Fin. Leasing, Inc.*,
    2006 WL 224000 (N.J. Super. Ct. Law Div. Jan. 27, 2006) ................... 4

*Reyes v. Netdeposit, LLC*,
    802 F.3d 469 (3d Cir. 2015) ................................................................... 11

*Ritti v. U-Haul Int'l., Inc.*,
    2006 WL 1117878 (E.D. Pa. Apr. 26, 2006)........................................... 13

*Rodriguez v. Nat'l City Bank*,
    726 F.3d 372 (3d Cir. 2013) ................................................................... 11

*Rose v. Bank of America Corp.*,
    2014 WL 4273358 (N.D. Cal. Aug. 29, 2014) ....................................... 3

*Somogyi v. Freedom Mortg. Corp.*,
    2023 WL 8113242 (D.N.J. Nov. 22, 2023) ............................................ 1

*Somogyi v. Freedom Mortg. Corp.,*
    495 F. Supp. 3d 337 (D.N.J. 2020) ........................................................ 2

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001) ................................................................ 11

*Sullivan v. DB Investments, Inc.*
    667 F.3d 273 (3d Cir. 2011) ................................................................ 14

*United States v. Dish Network LLC*,
    256 F. Supp. 3d 810 (C.D. Ill. June 5, 2017) ...................................... 24

*Vasco v. Power Home Remodeling Grp. LLC,*
    2016 WL 5930876 (E.D. Pa. Oct. 12, 2016) ................................. Passim

*Wakefield v. ViSalus, Inc.*,
    51 F.4th 1109 (9th Cir. 2022) .............................................................. 24

*Walker v. Highmark BCBSD Health Options, Inc.*,
    2022 WL 17592067 (W.D. Pa. Dec. 13, 2022) ................................. 3, 25

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................. 11

**Statutes**

47 U.S.C. § 227(b)(1) ................................................................................. 2

47 U.S.C. § 227(b)(3)(B) .................................................................... 23, 24

47 U.S.C. § 227(c)(5) ..................................................................... 2, 23, 24

47 U.S.C. § 227(c)(5)(B) ........................................................................ 23

47 U.S.C. § 227(c)(5)(C) ........................................................................ 24

Section 1542 of the California Civil Code ................................................ 9

**Rules**

Fed. R. Civ. P. 23 ......................................................................... 10, 15, 16

Fed. R. Civ. P. 23(a) .................................................................... 10, 11, 12

Fed. R. Civ. P. 23(a)(1) ........................................................................... 11

Fed. R. Civ. P. 23(a)(2) ..................................................................... 11, 12

Fed. R. Civ. P. 23(a)(3) ................................................................................................ 12

Fed. R. Civ. P. 23(a)(4) ................................................................................................ 12

Fed. R. Civ. P. 23(b) .................................................................................................... 10

Fed. R. Civ. P. 23(b)(3) ......................................................................................... 10, 14

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................................... 15, 20

Fed. R. Civ. P. 23(e) .................................................................................................... 16

Fed. R. Civ. P. 23(e)(1)(B) .......................................................................................... 15

Fed. R. Civ. P. 23(e)(2) ................................................................................................ 16

Fed. R. Civ. P. 30(b)(6) ............................................................................................ 6, 18

## <u>INTRODUCTION</u>

On January 2, 2025, this Court preliminarily approved the class action settlement between Plaintiffs Thomas Niemczyk, Rick Hill, and Barry Wolford ("Plaintiffs") and Pro Custom Solar LLC, d/b/a Momentum Solar ("Momentum" or "Defendant") and directed that notice be sent to the Settlement Class. (ECF No. 36). The settlement administrator, Angeion Group ("Angeion") has implemented the Court-approved notice plan and direct notice has been sent to approximately 92% of the certified Settlement Class. The reaction from the Class has been overwhelmingly positive. Specifically, of the approximately 4.1 million Settlement Class Members, **<u>zero</u>** objected, and only one (1) requested to be excluded.[1]

The total settlement value is at least $20-$22 million, and up to $30 million if a qualifying Liquidity Event occurs. The size of the Common Fund here easily dwarfs the largest TCPA settlements in this Circuit. *See e.g., Vasco v. Power Home Remodeling Grp. LLC,* No. CV 15-4623, 2016 WL 5930876, at *10-12 (E.D. Pa. Oct. 12, 2016) ($5.2 million settlement fund); *Somogyi v. Freedom Mortg. Corp.,* No. CV1706546RMBMJS, 2023 WL 8113242, at *1 (D.N.J. Nov. 22, 2023) ($9.5 million fund); *Myers v. Jani-King of Philadelphia, Inc.,* No. CV 09-1738, 2019 WL 4034736, at *2 (E.D. Pa. Aug. 26, 2019) ($3.7 million settlement fund). Indeed, Plaintiffs believe that this is the biggest non-reversionary cash common fund *ever* in a pure telemarketing class action brought under the Telephone Consumer Protection Act ("TCPA"), and the biggest non-reversionary cash common fund in *any* TCPA action settled after the Supreme Court's decision in

---

[1] The deadline for Settlement Class Members to request to be excluded was July 28, 2025. *See* Declaration of Steven Weisbrot of Angeion Group Regarding Settlement Administration ("Weisbrot Decl.") ¶19 submitted herewith. The deadline for Settlement Class Members to object was July 28, 2025. *Id.* ¶ 20.

*Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), which effectively gutted the TCPA's restrictions on the use of automatic telephone dialing systems ("ATDS").[2]

In consideration for the release and dismissal with prejudice of all claims in this action, the Settlement provides class members with substantive and substantial benefits: namely, *the average claimant is anticipated to receive approximately $1,266 to $1933.*[3] Given that the Settlement allows claims of up to 50 calls per claimant, some claimants are likely to receive substantially more. Again, this dwarfs other per claimant recoveries in TCPA cases in this circuit and around the country. *See e.g., Vasco,* 2016 WL 5930876, at *12 (awarding approximately $26.60 per claimant); *Somogyi v. Freedom Mortg. Corp.,* 495 F. Supp. 3d 337, 345 (D.N.J. 2020) (awarding anticipated award per claimant of $37.61 but the actual payment was $75.30); *Brown v. Rita's Water Ice Franchise Co. LLC,* No. CV 15-3509, 2017 WL 4102586, at *4 (E.D. Pa. Sept. 14, 2017) (awarding $144 payment

---

[2] By "telemarketing," Plaintiffs refer to claims brought under 47 U.S.C. § 227(c)(5), which require proof of *two* or more *telemarketing* calls within a 365-day period without prior express written consent. ATDS claims, where plaintiffs could allege the receipt of *one* or more calls using ATDS without prior consent are asserted under 47 U.S.C. § 227(b)(1), have almost universally failed after *Duguid*. *See* Trevor Cook, "Pleas" Don't Hang Up: The Viability of Telephone Consumer Protection Act Claims Based on Calls by Automatic Telephone Dialing Systems After Facebook *v. Duguid*, 58 Gonz. L. Rev. 411, 424 (2023) (noting "the courts granted twenty-one out of twenty-two defendant motions for summary judgment" of the fifty-three "sample cases that have progressed past the pleading stage.)"); Niall T. Martin, Stop Telephonin' Me: The Problematically Narrow Conception of Telemarketing Abuse Under the TCPA, 2022 Wis. L. Rev. 997, 1020 (2022) ("Because the narrow *Duguid* decision made it more difficult for consumers to prevail against a TCPA violator, it is no wonder that in the six months following the decision there were a decrease of roughly thirty-nine percent in the number of TCPA-related federal lawsuits filed."). Before *Duguid*, the ATDS claims were the main driver of virtually every TCPA class action settlement. Every TCPA class settlement that Plaintiffs have been able to locate with a higher non reversionary common fund pre-dates *Duguid* and involves at minimum a hybrid 47 U.S.C. § 227(c)(5) and 47 U.S.C. § 227(b)(1) settlement. This Settlement narrowly resolves claims solely for people that received "two or more telemarketing calls," and thus effectively carves out any claims for people that may have independent claims under the TCPA's ATDS provisions. *See* Settlement § AA (definition of Settlement Class Member(s)).

[3] Though the claims deadline is still open, Class Counsel anticipate roughly 10,000 claims based on roughly 7,500 claims being submitted through the end of June 2025. Accordingly, to get the above per claimant figures, Class Counsel subtracted the following from $20 million and $30 million, respectively: 1) an award of fees of 33%, 2) an award of Class Counsel costs and expenses of roughly $496,186.49, and 3) administration costs of roughly $500,000. Those figures were then divided by 10,000 to arrive at the estimated per claimant amounts.

to TCPA class members); *Walker v. Highmark BCBSD Health Options, Inc.,* No. 2:20-CV-01975-CCW, 2022 WL 17592067, at *5 (W.D. Pa. Dec. 13, 2022) (awarding $70.69 for each eligible call); *Friedman v. LAC Basketball Club, Inc*., 2014 WL 10677588 (C.D.Cal.) (final approval of TCPA settlement providing class members with either (i) two free tickets to a Los Angeles Clippers' home game or (ii) one free ticket and a $20 voucher for use at the Team LA Store in the Staples center); *Kazemi v. Payless Shoesource, Inc.*, 2012 WL 8435251 (N.D.Cal.) ($25 merchandise certificate per claimant); *Couser v. Comenity Bank*, No. 12-2484, ECF/CM Doc. No. 91 (S.D. Cal. May 27, 2015) (approximately $13.75 per claimant); *In re Capital One TCPA Litigation*, No. 12-10064, ECF/CM Doc. No. 329 (N.D. Ill. February 12, 2015) (at least $34.60 per claimant); *Rose v. Bank of America Corp.*, No. 11-2390, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) (average of $20 to $40 per claimant); *id.* (referencing *Arthur v. Sallie Mae* TCPA settlement, in which each claimant received approximately $20 to $40); *Malta v. Fed. Home Loan Mortgage Corp.*, No. 10-CV-1290 BEN NLS, 2013 WL 444619, at *7 (S.D. Cal. Feb. 5, 2013) (approximately $2 per claimant if all eligible claimants filed claims); *Browning v. Yahoo!, Inc.*, 2007 WL 4105971 (N.D.C.A. 2007) (either "a free Experian credit score ($5.00 retail value) or two months of free credit monitoring service ($9.95/mo. retail value)").

Defendant's settlement payment will also pay the costs of service awards to Plaintiffs, notice and administration costs, as well as reasonable attorneys' fees, plus costs and expenses for proposed Class Counsel from the all-in Common Fund established. (*See* Class Action Settlement Agreement ("Settlement") or ("SA") §§ I.J; III.A.).

The Settlement is the culmination of more than five years of hard-fought litigation and is the product of extensive, arm's-length settlement negotiations spanning multiple years, including an all-day mediation lead by a neutral mediator and two in-person meetings between the parties and Plaintiffs' expert. Weighing the benefits of the Settlement against the risks associated with

proceeding in litigation and in collecting on any judgment, the Settlement is more than reasonable. Where, as here, you have "the benefits of immediate settlement" providing a known monetary amount to Settlement Class Members, compared to an "unpredictable" amount "if plaintiff was ultimately successful," the settlement is reasonable.  *New York Career Guidance Servs., Inc. v. Wells Fargo Fin. Leasing, Inc.,* No. BER-L-1705-03, 2006 WL 224000, at *7-8 (N.J. Super. Ct. Law Div. Jan. 27, 2006).

Given that the settlement is reasonable, assures immediate payment, and the reaction to it from the Class has been overwhelmingly positive, the Settlement is fair, reasonable, and adequate, as explained further below, and warrants this Court's final approval.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Plaintiffs allege that Defendant made uninvited calls to cellular phone numbers using an automatic telephone dialing system ("ATDS") without the recipient's prior express consent in violation of the TCPA.  (*See generally*, Third Amended Complaint, ECF No. 97 ("TAC")).

Defendant denies all of Plaintiffs' allegations. Nevertheless, Momentum has agreed to the settlement to avoid the time, inconvenience, costs and uncertainty of protracted litigation.

### B.    Procedural History

Plaintiff Niemczyk initiated this action by filing a complaint on March 5, 2019, in the United States District Court for the District of New Jersey (the *Niemczyk* Action). (ECF No. 1). On May 20, 2019, Defendant filed a motion to dismiss the Plaintiff's amended complaint (ECF No. 6) and on July 14, 2019, Defendant filed a motion to dismiss Plaintiff's second amended complaint. (ECF No. 12). The Court denied Defendant's motion to dismiss on  April 1, 2020. (ECF No. 26).

On January 19, 2022, Plaintiffs Walters, Hill, and Wolford filed the *Walters* Action in the United States District Court for the District of New Jersey against Defendant, alleging claims for violations of the TCPA and Florida TCPA ("FTCPA"). (*See generally*, Class Action Complaint, ECF No. 1). The *Walters* Action was determined to be related to and consolidated with the *Niemczyk* Action, was also assigned to District Judge Esther Salas and Magistrate Judge Michael Hammer, and the two actions were effectively litigated as one case from that point forward. On March 25, 2022, the Court issued an order denying Defendant's motion for judgment on the pleadings and motion to strike Plaintiff's class definitions. (ECF No. 94).

Discovery was extremely contentious, involving multiple motions to compel and numerous discovery conferences with the Court. (*See* Declaration of Matthew Mendelsohn ("Mendelsohn Decl.") at ¶ 12). There were around a dozen discovery orders by the Court concerning contested motions to compel or resolution of discovery dispute letters. (*Id.*) Defendant produced millions of call logs and lead files spanning the length of the class period as well as the production of internal do not call lists. (*Id.* ¶ 13). Plaintiffs reviewed hundreds of thousands of pages of Defendant's internal email correspondence and electronic records as well as current and former customer lists. (*Id.*) The Plaintiffs undertook significant third-party discovery including a motion to compel compliance with a subpoena in another jurisdiction and the review of productions from Defendant's third-party vendor. (*Id.* ¶ 14). Plaintiffs hired experts to review Defendant's financial records which enabled the Parties to evaluate Defendant's ability to withstand a judgment should Plaintiffs have prevailed at trial and the maximum amount of money that Defendant could contribute to a settlement while still having a reasonable probability of staying in business. (*Id.* ¶ 15).

Defendant took the depositions of Plaintiffs Niemczyk, Hill, and Wolford, and Plaintiffs took the depositions of three witnesses Defendant designated as corporate representatives pursuant

to Fed. R. Civ. P. 30(b)(6). (*Id*. ¶ 16). Plaintiffs produced four expert reports; and the Parties completed all fact and expert discovery. (*Id*.)

This discovery together with the Court's Opinion on the motion to dismiss provided guidance on the strengths and weaknesses of the claims and allowed Plaintiffs' counsel to carefully analyze the risk of future litigation in comparison to the relief offered by the Settlement. (*Id*. ¶ 17).

### C.    History of Settlement Discussions

On March 30, 2023, the Court ordered the Parties to meet and confer to select a mediator. (ECF No. 127). On June 19, 2023, the Parties participated in a mediation before retired Judge Wayne R. Andersen. (Mendelsohn Decl. ¶ 18). As part of the mediation, the Plaintiffs prepared a detailed mediation statement that included prospective damages calculations. (*Id*.) While the Parties did not reach a settlement at the mediation, settlement discussions continued and included an in-person meeting between the Parties and Plaintiffs' expert in New York in October 2023 and another in-person meeting between the Parties in Louisville, Kentucky in February 2024. (*Id*. ¶ 19). Contentious settlement discussions continued for several months leading up to the signing of a binding Term Sheet memorializing the material terms of this Settlement on June 19, 2024, that were overseen by Judge Andersen within the scope of the continuing mediation. (*Id*. ¶ 20). Matters were so contentious that Plaintiffs were days away from filing a contested motion for class certification prior to reaching this Settlement. (*Id*.)

All the terms of the Settlement Agreement are the result of arm's-length negotiations between experienced counsel for both sides. (*Id*. ¶ 24). The named Plaintiffs all approve of the Settlement. (*Id*.)

On September 20, 2024, the Parties moved the Court for an order preliminarily approving the settlement of the Action. (ECF No. 166). On January 2, 2025, the Court granted preliminary approval of the Settlement. (ECF No. 36).

## II.    KEY TERMS OF THE SETTLEMENT

The key terms of the Class Action Settlement Agreement, attached as Exhibit 1 to the Mendelsohn Declaration, are briefly summarized as follows:

### A.    Class Definition

The "Settlement Class" or "Settlement Class Members" is defined as:

> all persons in the United States who received two or more telemarketing Calls from Momentum or on behalf of Momentum within a 365-day period from March 5, 2015 through and including the date of preliminary approval of the Settlement by the Court.[4]

(*See* SA § I.AA.)

### B.    Monetary Relief in the Form of a Non-Reversionary Common Fund

Under the Settlement, Momentum agrees to pay $10 million over five years into a Common Fund. (SA § III.A.) The first payment in the amount of $1,000,000 will be paid into the Common Fund within 90 days ("Initial Payment Date") of the approval of the settlement by the Court (the "Court Approval Date"). Each subsequent payment into the Common Fund will be due on the first, second, third, fourth and fifth anniversary of the Initial Payment Date in the amounts of $2.0 million, $1.25 million, $1.75 million, $1.75 million and $2.25 million. (*Id.*) Beginning on the sixth anniversary of the Initial Payment Date, Momentum will begin annual payments of $1.2 million per year into the Common Fund, which will continue for ten (10) years until an additional $12 million has been paid for a total of $22 million. (*Id.*)

---

[4] Excluded from the Settlement Class are any judicial officer to whom the Action is assigned and any former customer of Momentum. (SA § I.AA.) The Settlement Class likewise excludes persons who validly request to opt-out of the Settlement. (*Id.*)

In addition, Momentum will pay into the Common Fund twelve percent (12%) of the Liquidity Event Proceeds from any Liquidity Events provided that the total amount paid into the Common Fund under all circumstances and via all means will not exceed $30 million (the "Settlement Payment Cap"). (SA § III.B.) The Settlement also has a "Quickpay Option": that is, if Momentum pays $20 million into the Common Fund via any means within seven years of the Court Approval Date, the Settlement amount owed will be deemed fully paid and no further payments will be owed by Momentum. (SA § III.C.)[5]

### C.    Timing of Payments to Class Members

Payments to Class Members will be made as soon as practicable at the discretion of the Claims Administrator after each time at least $1,000,000 is accumulated in the Common Fund for the benefit of Class Members. (SA § III.H.)

### D.    Class Member Claims Process

Class Members will be permitted to submit claims either by mail or online through the Settlement Website for up to 50 calls received within the Class Period. (SA § III.I.) Class Members will have a maximum of 120 days to submit a claim from the date the first notice is disseminated. (SA § IV.D.) Class Members who file timely and valid claims will be entitled to a *pro rata* share of any amounts paid into the Common Fund on a per-call basis, net of any attorneys' fees, costs, expenses, or any other claims or administration expenses associated with administering the Settlement, until the entirety of the Common Fund is exhausted. (SA § III.H.)

### E.    Release

In exchange for the foregoing, Plaintiffs and Class Members who do not timely exclude

---

[5] To the extent that the entirety of the Common Fund has been paid off, but less than $1,000,000 remains in the Common Fund owing to the Class Members, the Claims Administrator will pay out as much as is administratively feasible to Class Members, with any remainder to be distributed to a *cy pres* recipient to be approved by the Court. (SA § III.H.)

themselves will be bound by a release of all claims arising out of or relating to the claims that were asserted in the Litigation (the "Settlement Class Member Release"). (SA § VII.A.) The Settlement Class Member Release will extend to Defendant and their related entities and persons. Plaintiffs also expressly waive and relinquish all rights and benefits against Momentum afforded under Section 1542 of the California Civil Code or under any similar statute or legal theory (the "Class Representatives' Individual Releases"). (SA § VII.B.) The Settlement Agreement provides that upon final approval of the Settlement, the case will be dismissed with prejudice. (SA § XI.)

### F.    Notice and Administration Expenses

The Common Fund will be used to pay the cost of Settlement Administration Expenses, which includes sending the Notice set forth in the Agreement and any other notice as required by the Court, as well as all costs of administering the Settlement. (SA § V.)

### G.    Incentive Awards, Attorneys' Fees, Costs, and Expenses

In recognition for their efforts on behalf of the Settlement Class, the Settlement requests a service award of $7,500 from the Common Fund for Plaintiff Thomas Niemczyk as appropriate compensation for his time and effort serving as Class Representative and as a party to the Action. (SA § IX.E.); *see also*, Mendelsohn Decl. ¶¶ 47-50. Plaintiffs Rick Hill and Barry Wolford request a service award payment of $5,000 each, as compensation for their efforts in filing the complaints, undergoing depositions, making themselves available at mediations, and achieving settlement for the class. (SA § IX.E.)

Plaintiffs seek payment of an award of attorneys' fees of one-third of the Common Fund for Smith Krivoshey, PC, Bursor & Fisher, P.A., and Mazie Slater Katz & Freeman, LLC (Class Counsel), subject to Court approval.  (SA § IX.A.)  Class Counsel will be paid their attorneys' fees from each installment payment made into the Settlement Fund, and therefore will be paid over time as the Class gets paid.  In addition, Class Counsel seek all their reasonable costs and expenses

to be paid out of any amounts paid into the Common Fund. *Id*. These awards are subject to this Court's approval, which Plaintiffs have moved for separately. (*See* ECF No. 170).

## **ARGUMENT**

## I.    **CLASS CERTIFICATION FOR SETTLEMENT PURPOSES IS APPROPRIATE**

The Court's Preliminary Approval Order provisionally certified a class for settlement purposes of: "[a]ll persons in the United States that received two or more telemarketing calls ("Calls") from Momentum or on behalf of Momentum within a 365-day period from March 5, 2015 through and including the date of preliminary approval of the Settlement by the Court ("Class Period")." (ECF No. 36 ¶ 5 (the "Settlement Class")).

Under Federal Rule of Civil Procedure 23, a class action may be maintained if all the prongs of Rule 23(a) are met, as well as one of the prongs of Rule 23(b). Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a). Rule 23(b)(3) requires the Court to find that:

> Questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). In the Third Circuit, Rule 23, the class action rule, "should be liberally construed, and such an action should be permitted unless there is a clear showing that it is inappropriate or improper." *Lusky v. Capasso Bros.,* 118 N.J. Super. 369, 373, 287 A.2d 736, 738 (App. Div. 1972).

The Court should now grant final certification because the Settlement Class meets all the requirements of Rule 23(a) and Rule 23(b)(3). *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d

516, 540 (3d Cir. 2004) (granting plaintiffs' motion for class certification because these requirements are met). Indeed, by granting preliminary approval, this Court has already determined that class certification for settlement purposes is warranted. (ECF No. 36 ¶ 6).

## A.    Numerosity

Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[G]enerally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the [numerosity requirement] of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-227 (3d Cir. 2001) (citation omitted). Here, the settlement class consists of approximately 4.1 million members, so the numerosity requirement is easily satisfied. (Mendelsohn Decl. ¶ 31).

## B.    Commonality

Rule 23(a)(2) requires that a plaintiff establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This threshold is satisfied if the question is "capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[A] single [common] question will" satisfy the commonality inquiry. *Id.* at 359. This "bar is not a high one." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)). The Third Circuit has "acknowledged commonality to be present even when not all plaintiffs suffered an actual injury, when plaintiffs did not bring identical claims, and, most dramatically, when plaintiffs' claims may not have been legally viable[.]" *Id.*; *see also In re Prudential Ins. Co. Sales Litig.*, 148 F.3d 283, 310 (3d Cir. 1998) ("A finding of commonality does not require that all class members share identical claims, and factual differences among the claims . . . do not defeat certification").

11

In this case, there are numerous common questions of law and fact, including a) whether Momentum's conduct in calling the Class Members violated the Act; b) whether Momentum had proper consent from the recipients of the calls; c) whether Momentum's calls constituted telemarketing or solicitation; and d) whether Momentum's violations were knowing or willful. *See Vasco*, 2016 WL 5930876, at *3. These common questions, which target the same alleged misconduct by Momentum, satisfy Rule 23(a)(2).

### C.    Typicality

The next requirement – typicality – requires that a class representative have claims that are typical of those of the putative class members. Fed. R. Civ. P. 23(a)(2). Rule 23(a)(3)'s typicality requirement is also met because Plaintiffs' claims are typical of the claims of the whole Class because they arise from the same factual basis—*i.e.*, solicitation calls sent to Class Members without written prior express consent in violation of the TCPA. *See Vasco*, at *3 (Plaintiff "demonstrates typicality because he shows Power Home engaged in the same conduct toward him and the Class Members, which caused the same injury to both him and the Class Members."); *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994); *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 149 (D.N.J. 2013) (stating "low threshold"—"if the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established.'") (citation omitted).

### D.    Adequacy

The final Rule 23(a) prerequisite requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing the adequacy of a proposed class representative, courts consider whether he or she "has the ability and incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class."

*Ritti v. U-Haul Int'l., Inc.*, 05-4182, 2006 WL 1117878, at *5 (E.D. Pa. Apr. 26, 2006) (quoting *Hassine v. Jeffres*, 846 F.2d 169, 179 (3d Cir. 1988)).

Here, all the Class Representatives are adequate because their claims are typical of those of other Class Members and seek the same relief as the other Class Members. (*See* TAC ¶¶ 12-43; Mendelsohn Decl. ¶ 49). Each Plaintiff recognizes and accepts their responsibilities as a class representative and has actively participated in the litigation of this case and communicated regularly with their attorneys about the proceedings. (*Id*.) Each Plaintiff understands the obligations of serving as Class Representative, has adequately represented the interests of the putative class thus far, and has retained experienced legal counsel. (*Id*.) They each met with their attorneys for the initial consultation, participated in calls regarding fact-finding efforts by their attorneys, and held in-person and telephonic meetings with counsel. (*Id*.) Each Plaintiff made time to undergo a deposition and conferred with counsel beforehand to prepare for those depositions. (*Id*.) When Counsel attended a full-day mediation with Defendant and two in-person meetings with Defendant, the Plaintiffs made themselves available on those dates. (*Id*.)

Likewise, Class Counsel is also adequate as the attorneys drew upon their experience with similar complex lawsuits (*see* firm resumes, Mendelsohn Decl., Exs. 2-4) to negotiate an excellent resolution for the Settlement Class. The substantial benefits offered through the settlement speak to Class Counsel's more than adequate work. Further, Class Counsel has devoted substantial resources to the prosecution of this action by investigating Plaintiffs' claims and that of the Settlement Class Members, aggressively pursuing those claims through motion practice, conducting both formal and informal discovery, participating in a private meditation, and ultimately, negotiating a favorable settlement. (Mendelsohn Decl. ¶¶ 6, 8-11, 12-17, 18-22). In sum, Class Counsel has vigorously prosecuted this action and will continue to do so throughout its pendency. (*Id.* ¶ 42).

13

Accordingly, since Plaintiffs and Class Counsel have demonstrated their commitment to representing the Settlement Class and neither have interests antagonistic to the Settlement Class, the adequacy requirement is satisfied.

### E.    The Proposed Settlement Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that common questions of law or fact not only be present, but "predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Courts are "more inclined to find the predominance test met in the settlement context." *Vasco*, 2016 WL 5930876, at *4. Here, there are several common questions of fact and law that predominate over any questions that may affect individual Settlement Class Members. If the case were to proceed, the ultimate issues would center on Defendant's common course of conduct – namely, whether Momentum "engaged in a common course of conduct by making unsolicited telemarketing calls to the Class Members." *Id*. at *4. Accordingly, predominance is satisfied.

The second prong of Rule 23(b)(3) – that a class action be superior to other available methods for the fair and efficient adjudication of the controversy – is also readily satisfied. *See* Fed. R. Civ. P. 23(b)(3). Superiority requires the Court to consider whether "a class action is superior to other available methods of fairly and efficiently adjudicating the controversy." *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 296 (3d Cir. 2011) (citations omitted); *see McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 457 (D.N.J. 2008). Given that an individual action under the TCPA "may not be financially feasible" given the "costs of prosecuting an action, which includes the initial filing fee, [which] could easily swallow a large portion of an individual claimant's recovery,"

14

this and other considerations could "easily render an individual lawsuit cost ineffective.' *Vasco*, 2016 WL 5930876, at \*7.

Moreover, the Parties' settlement will relieve the "needless duplication of effort," burdens, and other inefficiencies that would result from repeated adjudication of the same issues. *Henderson v. Volvo Cars of N. Am., LLC*, 2013 WL 1192479, \*6 (D.N.J. Mar. 22, 2013) (citing *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 252-53 (S.D. Tex. 1978)). The Settlement Agreement provides Class Members with prompt, certain, and adequate relief, and establishes clearly defined administrative procedures to ensure due process and preservation of rights.

Thus, a class action for settlement purposes is a superior means of resolving this controversy. Accordingly, Plaintiffs request that the Court certify the Settlement Class. *See* Fed. R. Civ. P. 23(e)(1)(B).

## II.     THE NOTICE PLAN COMPORTS WITH DUE PROCESS

Before final approval can be granted, due process and Rule 23 require that the notice provided to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). The notice must clearly state essential information regarding the settlement, including the nature of the action, terms of the settlement, and class members' options. *See* Fed. R. Civ. P. 23(c)(2)(B).

The Federal Judicial Center notes that a notice plan is reasonable if it reaches at least 70% of the class. *See* Fed. Judicial Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 3 (2010). The notice plan here easily meets these standards, as it provided direct notice via a postcard or email to 92% of the Settlement Class. (*See* Mendelsohn Decl. ¶ 39).

At preliminary approval, the Court approved the Parties' proposed Notice Plan, finding its form and content met the requirements of Rule 23 and due process. (*See* ECF No. 36, ¶ 9). The

Plan has now been fully carried out by professional settlement administrator Angeion. Pursuant to the Settlement, Defendant provided Angeion with a list of 4,160,147 putative class members, including names, addresses, and email addresses. (Weisbrot Decl. ¶ 6). Angeion provided direct notice to Class Members by sending more than 3.47 million emails and over 360,000 postcards (for class members without valid email addresses). (Weisbrot Decl ¶¶8-12).  Accordingly, the Court-approved notice was successfully transmitted to 92% of the Settlement Class directly. (*See id.*).[6] On July 1, 2025, Angeion also caused a reminder email campaign to be sent to the 3.2 million Class Members with valid email addresses who had not yet filed a claim.  (*Id*. ¶ 13.) These summary notices also directed Settlement Class Members to the Settlement Website, where they were able to submit claims online; access important court filings, including the Motion for Attorneys' Fees and all related documents; and see deadlines and answers to frequently asked questions. (*See id.* ¶ 16). Further, Angeion implemented a robust digital notice campaign that resulted in 4.6 million impressions (*See id*. ¶ 14).

Given the broad reach of the notice, and the comprehensive information provided, the requirements of due process and Rule 23 are easily met.

## III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

Final approval of the Settlement is appropriate here because it is procedurally and substantively fair, adequate, and reasonable. *See* Fed. R. Civ. P. 23(e)(2).[7] "There is a 'strong presumption in favor of voluntary settlement agreements' in the class action context. This presumption is especially strong in 'class actions and other complex cases where substantial

---

[6] On September 30, 2024, Angeion also notified the appropriate state and federal officials pursuant to CAFA.  (*See* Weisbrot Decl. ¶ 5).

[7] Effective December 1, 2018, Rule 23(e) was amended.  The 2018 amendment to Rule 23(e) provides factors for the Court to consider for approval of a proposed class action settlement.  *See* Fed. R. Civ. P. 23(e)(2).

judicial resources can be conserved by avoiding formal litigation.'" *Vasco*, WL 5930876, at *4 (internal quotations omitted). The settlement is "entitled to a presumption of fairness" if "'(1) the negotiations occurred at arms-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Id.* at *5.

> ### A.    The Proposed Settlement is Procedurally Fair (Fed. R. Civ. P. 23(e)(2)(B))

The circumstances surrounding the Settlement support the finding that the Settlement is procedurally fair.

First, this Settlement was reached after more than five years of litigation and is the product of extensive, arm's-length settlement negotiations spanning multiple years, including a June 19, 2023 mediation before Honorable Wayne R. Andersen (Ret.); settlement discussions that included an in-person meeting between the Parties and Plaintiffs' expert in New York in October 2023; another in-person meeting between the Parties in Louisville, Kentucky in February 2024; and continuous settlement discussions over the next couple of months leading up to the signing of a binding Term Sheet memorializing the material terms of this Settlement on June 19, 2024 that were overseen by Judge Andersen within the scope of the continuing mediation. (Mendelsohn Decl. ¶¶ 18-20).

Second, discovery was robust and extremely contentious, involving multiple motions to compel and numerous discovery conferences with the Court. (Mendelsohn Decl. at ¶ 12). There were around a dozen discovery orders by the Court concerning contested motions to compel or resolution of discovery dispute letters. *Id.* Defendant produced millions of call logs and lead files spanning the length of the class period as well as the production of internal do not call lists. (*Id.* ¶ 13.) Plaintiffs reviewed the production of hundreds of thousands of Defendant's internal email correspondence and electronic records as well as current and former customer lists. (*Id.*) The

Plaintiffs undertook significant third-party discovery including a motion to compel compliance with a subpoena in another jurisdiction and the review of productions from Defendant's third-party vendor. (*Id*. ¶ 14.) Plaintiffs hired experts to review Defendant's financial records which enabled the Parties to evaluate Defendant's ability to withstand a judgment should Plaintiffs have prevailed at trial and the maximum amount of money that Defendant could contribute to a settlement while still having a reasonable probability of staying in business. (*Id*. ¶ 15.) Defendant took the depositions of Plaintiffs Niemczyk, Hill, and Wolford, and Plaintiffs took the depositions of three witnesses Defendant designated as corporate representatives pursuant to Fed. R. Civ. P. 30(b)(6). (*Id*. ¶ 16.) Plaintiffs produced four expert reports; and the Parties completed all fact and expert discovery. (*Id*.)

Third, the settlement was the result of experienced, capable counsel who believe the settlement is in the best interests of their respective clients. (*Id*. ¶ 29.) Class Counsel verified the adequacy of the Settlement by interviewing Class Members, reviewing Defendant's sensitive financial and accounting documents, deposing Defendant's IT Manager, Mike Giudice, on April 12, 2023; Defendant's VP of Inside Sales, Jeffrey Anclien on March 28, 2023; and its VP of Marketing Joshua Buma on March 27, 2023, and consulting extensively with four technical experts retained by Plaintiffs' Counsel. (Mendelsohn Decl. ¶ 16). The settlement is well supported and will eliminate the uncertainties and risks to the Parties from proceeding further in the litigation.

Fourth, no class members objected to the settlement because the agreement delivers immediate and significant relief to them, as discussed herein.

Accordingly, given the foregoing, the Third Circuit adopts "a presumption of fairness to the Settlement Agreement" and this Court should find it is procedurally fair. *Vasco*, at *5.

**B.      The Proposed Settlement is Substantively Fair**

In addition to being procedurally fair, the Settlement is also substantively fair, reasonable, and adequate. Courts in the Third Circuit evaluate the substantive fairness, adequacy, and reasonableness of a settlement according to the factors set out *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). The following nine factors inform the analysis at the final approval stage:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) stage of the proceedings and the amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risks of maintaining the class action through the trial; (7) ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

Here, the nine *Girsh* factors weigh in favor of final approval.

### 1. The complexity, expense and likely duration of the litigation (*Girsh* Factor 1)

This factor "captures the probable costs, in both time and money, of continued litigation." *Vasco*, 2016 WL 5930876, at *5. Here, by reaching a favorable settlement prior to trial, Plaintiffs seek to avoid significant expense and delay and instead ensure recovery for the class. (Mendelsohn Decl. ¶¶ 7, 36). Without the Settlement, the Parties would be engaged in contested motion practice and adversarial litigation for many more years. The claims advanced on behalf of the Settlement Class Members involve numerous complex legal and technical issues. Continued litigation would be time-consuming and expensive, with no certainty of a favorable outcome. (Mendelsohn Decl. ¶ 6). The Settlement Agreement secures substantial benefits for the Class with none of the delay, risk and uncertainty of continued litigation. Thus, *Girsh* Factor 1 weights in favor of final approval.

### 2. The reaction of the class to the settlement (*Girsh* Factor 2)

With the second *Girsh* factor, the Court judges the reaction of the class to the settlement. Here, the reaction of the Class to the settlement has been overwhelmingly positive. Class Notice has been provided to the Settlement Class Members in accordance with the requirements of Rule 23(c)(2)(B) and the Preliminary Approval Order (ECF No. 36, ¶¶ 9-15), and direct notice reached 92% of the Settlement Class. (*See* Mendelsohn Decl. ¶¶ 39-40; Weisbrot Decl. ¶¶ 8-13). Zero objected to the Settlement, and only one opted out (a mere 0.00002% of the Settlement Class). (Mendelsohn Decl. ¶ 40; Weisbrot Decl. ¶¶ 19-20). This exceptional participation rate and lack of objections from the Settlement Class leave no question that the Class Members view the Settlement favorably, which weighs heavily in favor of final approval and further supports the "presumption of fairness." Thus, *Girsh* Factor 2 weighs in favor of final approval.

### 3. The stage of the proceedings and amount of discovery completed (*Girsh* Factor 3)

The third *Girsh* factor is meant to "capture[] the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Vasco*, 2016 WL 5930876, at *5. Here, Class Counsel are sufficiently well-informed of the strengths and weaknesses of the claims, having drafted the pleadings, survived a motion to dismiss, and completed fact and expert discovery. (Mendelsohn Decl. ¶¶ 9, 12-17). The Parties engaged in considerable discovery in preparation for mediation. (Mendelsohn Decl. ¶¶ 12-17). Class Counsel were able to assess the size and scope of the putative class. (*Id*. ¶ 18). Momentum produced millions of call logs and lead files spanning the length of the class period as well as the production of internal do not call lists; hundreds of thousands of Defendant's internal correspondence and records; Defendant's financial records and insurance coverage; and even productions from Defendant's third-party vendor. (Mendelsohn Decl. ¶¶ 13-14). Class Counsel analyzed these documents and deposed Defendant's IT Manager, Mike Giudice, on April 12, 2023; Defendant's VP of Inside Sales, Jeffrey Anclien on March 28, 2023; and its VP of Marketing Joshua Buma on

March 27, 2023, and consulted extensively with four technical experts retained by Plaintiffs' Counsel. (Mendelsohn Decl. ¶ 16). As a result, Class Counsel had an adequate understanding of the merits of the case before negotiating a settlement and the discovery and depositions highlighted the variety of risks of getting a class certified in this case. (Mendelsohn Decl. ¶ 17). In sum, Class Counsel was well-positioned to evaluate the strengths of Plaintiffs' claims, Momentum's defenses, and prospects for success. (*Id*.). Thus, *Girsh* Factor 3 also weighs in favor of final approval.

### 4.      The risks of establishing liability and damages (*Girsh* Factors 4-5)

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Vasco*, 2016 WL 5930876, at *6.

Counsel assesses that the risks of establishing liability and damages are large. Plaintiffs' counsel have prosecuted many TCPA class actions which took several years to conclude; factoring in appeals, some lasted for over a decade. (Mendelsohn Decl. ¶ 6). Before ever approaching a trial in this case, the Parties would litigate class certification, a likely Rule 23(f) appeal, *Daubert* challenges, and summary judgment, requiring expenditure of considerable attorney time and resources as well as hard costs of additional expert witnesses, deposition practice, and e-discovery services. (*Id*.) Trial and post-trial activity would last several more years without any assurance of the relief now provided by the Settlement. *See Haas v. Burlington Cnty.*, No. 08-1102-NHL-JS, 2019 WL 413530, at *6 (D.N.J. Jan. 31, 2019) (granting approval where plaintiffs estimated the time to judgment, including trial, would take another three years). These risks (*Girsh* Factors 4 and 5) thus weigh in favor of settlement.

### 5.      The risks of maintaining the class through trial (*Girsh* Factor 6)

"[T]his factor measures the likelihood of obtaining and keeping a class certification if the

action were to proceed to trial." *Vasco*, 2016 WL 5930876, at *6. The risk of maintaining class status through trial is also present. The Court has not yet certified the proposed Class, and such a determination would be reached only after an exhaustive class certification brief is filed.  Were the Court to certify a class, Momentum would likely challenge certification through a Rule 23(f) petition and subsequently move to decertify, forcing additional rounds of briefing.  Risk, expense, and delay permeate such a process. The proposed settlement eliminates this risk, expense, and delay. Therefore, *Girsh* Factor 6 weighs in favor of final approval.

### 6. The ability of the defendants to withstand a greater judgment (*Girsh* Factor 7)

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Id.* Plaintiffs hired experts to review Defendant's financial records which enabled the Parties to evaluate Defendant's ability to withstand a judgment should Plaintiffs have prevailed at trial and the maximum amount of money that Defendant could contribute to a settlement while still having a reasonable probability of staying in business. (Mendelsohn Decl. ¶ 15).  After scrupulously analyzing Defendant's financial records with the help of an economics expert, Plaintiffs believe that the Settlement represents the *maximum that Momentum is able to pay while still having a reasonable probability of staying in business*. (*Id.*, *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d Cir. 2001) ("sustaining a larger judgment, and possibly even a larger settlement, might prove fatal" to defendant's business forcing Momentum to declare bankruptcy.); *Baldwin Emergency Med. Serv. v. Highmark, Inc.*, No. CIV.A. 03-1007, 2006 WL 1867902, at *4 (W.D. Pa. June 30, 2006) ([T]he purpose of a settlement is not to bankrupt a defendant but to achieve a fair and reasonable recovery for the class.").). Plaintiffs believe that the Settlement represents likely more than they could have recovered had they prevailed at trial, as collection issues would have been severe in an ensuing bankruptcy. *In re W.R. Grace & Co.*, 475 B.R. 34, 79 (D. Del. 2012) (Plaintiffs would encounter "difficulties" if

Momentum was "no longer a highly solvent company, but rather ha[d] only limited assets available to satisfy all of its outstanding liabilities."). Thus, this factor strongly weighs in favor of settlement.

> **7.** **The range of reasonableness of the common fund in light of the best possible recovery (*Girsh* Factor 8) and the range of reasonableness of the common fund to a possible recovery in light of all the attendant risks of litigation (*Girsh* Factor 9)**

"In reviewing the final two factors, we ask 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'" *Vasco*, 2016 WL 5930876, at *7. The eighth and ninth factors strongly support final approval. First and foremost, the Settlement likely represents the most that Defendant could ever pay. And, as discussed above, the Settlement is the biggest non-reversionary cash common fund ever in a pure telemarketing class action, and the biggest non-reversionary cash common fund in any TCPA action settled after the Supreme Court's decision in *Duguid*.

Further, the range of what could possibly be recovered in this case if it proceeded is exceedingly difficult to calculate, even at the close of fact and expert discovery and with Plaintiffs' service of all their expert reports, including a damages report. (Mendelsohn Decl. ¶ 33.) 47 U.S.C. § 227(b)(3)(B) provides a private right of action for sections of the TCPA dealing with ATDS and calls utilizing a prerecorded or artificial voice and allows recovery of a minimum of $500 per unlawful call. However, 47 U.S.C. § 227(c)(5) provides the cause of action for the released telemarketing claims at issue in the Settlement. Under § 227(c)(5)(B), a violation entitles class members "up to" $500 in damages per call. Accordingly, an established violation could entitle class members to anything from nominal damages of a few cents or a few dollars per call, up to $500 per call. That makes an analysis of a class damages recovery exceedingly difficult in a § 227(c)(5) case, as a jury finding class violations at trial for, *e.g.*, 10 million calls, can impose an award of

anywhere from $1,000 to $5 *billion*. (Mendelsohn Decl. ¶ 33.)  The Court would then have the discretion to potentially treble the jury's damages award if it found that a defendant's actions were knowing or willful. 47 U.S.C. § 227(c)(5)(C).  (*Id.*)

Over the past few years, realistic analyses of damages have become even more challenging in TCPA class actions.  In *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022), the Ninth Circuit vacated a $925,000,000 statutory damages judgment under 47 U.S.C. § 227(b)(3)(B) on Due Process grounds and instructed the district court to analyze the constitutionality of the nearly billion-dollar award.  Other circuits have reached similar results when presented with truly massive TCPA judgments. *See Golan v. FreeEats.com, Inc.* 930 F.3dd 950, 957, 962 (8th Cir. 2019) (affirming district court's reduction of $1.6 billion TCPA damages award to $32 million on Due Process grounds); *cf. United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 952, 982-83 (C.D. Ill. June 5, 2017) (reducing an $8.1 billion TCPA award down to $280 million), *reversed in part in United States v. Dish Network L.L.C.*, 954 F.3d 970, 979-80 (7th Cir. 2020) (vacating district court's damages order because it applied the incorrect test). *See also Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 466 (D. Md. 2012) (reducing TCPA award from over a hundred million dollars to $1 million).

At the $500 maximum, Plaintiffs' damages expert calculated statutory damages of $19.5 billion. That award is so shockingly large, however, that it fails to serve as a helpful guidepost in an analysis of this Settlement.  (Mendelsohn Decl. ¶ 33.)  First, Plaintiffs believe that the Settlement provides the absolute *maximum* that Momentum can pay and reasonably stay in business. (Mendelsohn Decl. ¶ 15.)  So, any damages amount above the recovery provided by the Settlement, whether $100 million or $19.5 billion, would likely have resulted in a smaller recovery because it would have immediately resulted in Momentum's bankruptcy. Second, because 47 U.S.C. § 227(c)(5) provides "up to" $500 for unlawful calls, a jury easily could have awarded 1 cent, or $1

dollar, per call, to avoid the specter of a massive judgment roughly equivalent to the GDP of Armenia.[8] And third, even if the jury awarded the maximum $500 per call, the Court and the Third Circuit (and possibly the Supreme Court) would likely have taken a hard look at the constitutionality of an award of that size. Plaintiffs do not take the position that a full statutory damages award would in fact be unconstitutional – they simply point out the possibility of a reduced judgment as a risk in ongoing litigation. As stated by another court overseeing a TCPA settlement, "[a]lthough the Act permits $500 per violation, the anticipated amount is fair, as 'a 'satisfactory settlement' may only 'amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'" *Vasco*, 2016 WL 5930876, at *10 (approving settlement with an anticipated per claimant award of $26). That is because "[r]eceiving less than the statutory damages provision allows class members to avoid the uncertainty and delays associated with trial." *Walker,* 2022 WL 17592067, at *5.

The Settlement permits a prompt resolution of this action on terms that are fair, reasonable, and adequate to the Class. This result will be accomplished years earlier than if the case proceeded to judgment through trial and/or appeals, and a likely bankruptcy, and provides certainty whereas litigation does not and could result in defeat for the Class on summary judgment, at trial or on appeal. Consequently, *Girsh* factors 8 and 9 weigh in favor of final approval of the Settlement.

* * *

In sum, all the *Girsh* factors weigh in favor of approval. The Settlement on its face is fair, adequate, and reasonable, and not a product of collusion. Thus, the Court should grant final approval.

---

[8] https://www.worldometers.info/gdp/armenia-gdp/

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion for Final Approval of the Settlement and enter the Final Approval Order in the form submitted herewith.

Dated: July 14, 2025                    Respectfully submitted,

<div style="margin-left: 3em">

*/s/ Matthew R. Mendelsohn*
Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: (973) 228-9898
mrm@mazieslater.com

Yeremey Krivoshey
**SMITH KRIVOSHEY, PC**
166 Geary Str STE 1500-1507
San Francisco, CA 94108
Tel: 415-839-7000
yeremey@skclassactions.com

Joseph I. Marchese
**BURSOR & FISHER, PA**
1330 Avenue of the Americas,
32nd Floor
New York, NY 10019
Tel: 646-837-7410
jmarchese@bursor.com

*Class Counsel*

</div>